# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JOSE ROBERT LOZANO, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-14-1297 |
| | § | |
| METROPOLITAN TRANSIT AUTHORITY | § | |
| OF HARRIS COUNTY, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court are defendant Metropolitan Transit Authority of Harris County's ("METRO") motion to enforce settlement agreement (Dkt. 61) and plaintiff Jose Robert Lozano's ("Lozano") motion to strike (Dkt. 90). Having considered the motions, related briefing, oral argument, and record evidence, the court is of the opinion that the motions should be GRANTED.

## I. BACKGROUND

Lozano worked as a law enforcement officer for METRO for over seven years. Dkt. 1 at 2. Following the receipt of anonymous complaints about Lozano and unflattering audio recordings of Lozano, METRO launched an internal investigation into his conduct. *Id.* As a result of the investigation, Lozano was demoted from sergeant to police officer. *Id.* at 4. On May 12, 2014, Lozano brought this Title VII lawsuit against METRO, alleging that METRO discriminated against him because he is Hispanic and retaliated against him because of his support for other Hispanic officers. *Id.* at 5–8. Lozano's discrimination claims were subsequently dismissed. Dkts. 26–27. Lozano's retaliation claim was set for trial on May 23, 2016. Dkt. 47.

On May 19, 2016, the court held the final pretrial conference.  Dkt. 55.  Prior to the conference, Lozano filed a motion in limine seeking to limit any mention of the audio recordings submitted to METRO.  Dkt. 35-8 at 5.  At the conference, the court denied the motion and held that the audio recordings would be allowed into evidence.  Dkt. 55.  Lozano's counsel, Alfonso Kennard ("Kennard") and Ronald Dupree ("Dupree") of Kennard Richard, P.C. ("Kennard Richard"), believed that the presentation of these audio recordings at trial would significantly reduce Lozano's likelihood of success and harm his reputation.  Dkt. 78 at 7–8; Dkt. 85 at 15–16.  In the following days, Kennard and Dupree discussed the possibility of settlement between themselves and with Lozano.  Dkt. 83, Ex. 13; Dkt. 83, Ex. 15.  On May 21, 2016, Lozano and his wife ("Ms. Lozano") met with Dupree to discuss the case.  Dkt. 68 at 7.  Later that day, Lozano also spoke by telephone with Kennard and Dupree,  and Ms. Lozano listened to the call.  *Id.* at 8; Dkt. 85 at 115.  Although the parties dispute the exact contents of these May 21, 2016 conversations, the discussions centered on the possibility of settlement.  Dkt. 68 at 7–8.

Following the pretrial conference, Kennard and Dupree also began to discuss settlement with counsel for METRO, Daniel Ramirez ("Ramirez").  Dkt. 61 at 2.  On the evening of May 21, 2016, the attorneys agreed to a settlement over the phone.  *Id.*  Ramirez subsequently sent an email to Kennard and Dupree, listing the terms of the settlement and requesting confirmation.  Dkt. 84, Ex. 1. The email also contemplated the subsequent preparation of formal settlement documents and indicated that Lozano should execute the formal settlement agreement by 1:00 pm the following day. *Id.*  Kennard responded that he "[a]greed" but indicated that he may not be able to deliver a signed copy of the formal settlement agreement by 1:00 pm.  Dkt. 84, Ex. 2.

On the morning of May 22, 2016, the parties informed the court that the case had settled and that they would waive the trial setting.  Dkt. 61 at 3. During the morning and afternoon, the attorneys

2

continued to exchange emails and drafts regarding the language in the formal settlement agreement.
Dkt. 83, Exs. 14, 18, 19.  Later in the day, Dupree met with the Lozanos, showed them a draft of the
formal settlement agreement, and discussed its contents.  Dkt. 68 at 10.  Lozano refused to sign the
settlement agreement.  *Id.* at 10–11.

On May 23, 2016, the court entered a conditional order of dismissal, noting that the case had
settled and retaining jurisdiction over the settlement agreement.  Dkt. 56.  The same day, METRO
placed Lozano on unpaid administrative leave, which was one of the conditions of the settlement
agreement.  Dkt. 68 at 11.

On June 3, 2016, METRO filed an "unopposed" motion to enforce the settlement agreement
and informed the court that Lozano had refused to sign the settlement documents.  Dkt. 57.  METRO
subsequently re-filed the motion to enforce after learning that Lozano was in fact opposed to the
motion.  Dkt. 61 at 1 n.1; *see also* Dkt. 58.  At oral argument, METRO stated that it specifically
seeks to enforce the essential terms of the agreement reflected in Ramirez's May 21, 2016 email.
*See* Dkt. 78 at 18, 26; *see also* Dkt. 84, Ex. 1 (Ramirez's email).

On June 8, 2016, Lozano formally terminated his attorney-client relationship with Kennard
Richard, and Kennard Richard moved to withdraw as counsel of record.  Dkt. 60.  Lozano retained
new counsel to represent him.  Dkt. 63.

On June 15, 2016, the court heard oral argument on METRO's motion to enforce the
settlement agreement and Kennard Richard's motion to withdraw as counsel of record.  *See* Dkts. 72,
78.  In his briefing and at oral argument, Lozano raised allegations that Kennard Richard either never
obtained authority to settle the case on his behalf or procured that authority through fraud, deception,
or coercion.  Dkt. 68 at 5.  The court determined that an evidentiary hearing would be required to

3

determine if an enforceable settlement agreement had been reached between the parties.  Dkt. 78 at 23–24.

On June 22, 2016, the court held the evidentiary hearing regarding the enforceability of the settlement agreement.  *See* Dkts. 82–85.  At the evidentiary hearing, the court granted Kennard Richard's motion to withdraw as counsel.  Dkt. 82.  The court also noted that the parties would be permitted to file supplemental briefing after the hearing.  Dkt. 85 at 284.  However, the court stated that Kennard Richard would not be permitted to file a brief.  *Id.*  After the hearing, METRO, Lozano, and Kennard Richard filed supplemental briefing.  Dkts. 87–89.  On July 2, 2016, Lozano moved to strike Kennard Richard's supplemental brief.  Dkt. 90.

## II. MOTION TO STRIKE

As noted above, the court granted Kennard Richard's motion to withdraw as counsel at the evidentiary hearing on June 22, 2016.  Dkt. 82.  The court explicitly instructed Kennard Richard that it would not be permitted to file a post-hearing brief.  Dkt. 85 at 284.  Despite this instruction, Kennard Richard filed a post-hearing brief.  Dkt. 88.  Given that Kennard Richard disregarded the court's direct instruction and that Kennard Richard is no longer counsel in this case, Lozano's motion to strike Kennard Richard's supplemental brief is GRANTED.

## III. MOTION TO ENFORCE

### A. Legal Standard

A district court has the "inherent power to recognize, encourage, and when necessary enforce settlement agreements reached by the parties." *Del Bosque v. AT&T Advert., L.P.*, 441 F. App'x 258, 260 (5th Cir. 2011) (quoting *Bell v. Schexnayder*, 36 F.3d 447, 449 (5th Cir.1994)); *see also Weaver v. World Fin. Corp. of Tex.*, No. CIV.A. 3:09-CV-1124G, 2010 WL 1904561, at *1 n.1 (N.D. Tex. May 12, 2010) (noting that where the court's order of dismissal states that it retains jurisdiction over

4

the settlement agreement, the court has subject matter jurisdiction to enforce the agreement). When considering the validity of a settlement agreement in a Title VII case, the court applies federal law. *See Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir. 1981) (per curiam) (explaining that a "significant federal interest" is at stake in a Title VII settlement because "Congress has mandated a policy of encouraging voluntary settlement of Title VII claims"); *see also Mid-S. Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389 (5th Cir. 1984) ("Questions regarding the enforceability or validity of [settlement] agreements are determined by federal law—at least where the substantive rights and liabilities of the parties derive from federal law."). Under federal law, a settlement agreement is a contract. *Lopez v. Kempthorne*, No. CIV.A. H-07-1534, 2010 WL 4639046, at *4 (S.D. Tex. Nov. 5, 2010) (Harmon, J.). "The federal law of contracts 'uses the core principles of the common law of contracts that are in force in most states.'" *Id.* (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003) (per curiam)). "These core principles can be derived from the Restatements." *Deville v. U.S. ex rel. Dep't of Veterans Affairs*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) (per curiam). However, because "the federal common law of release is largely undeveloped and federal contract law is largely indistinguishable from general contract principles under state common law," the court may rely on federal cases, state contract law cases, and other treatises to the extent it finds them persuasive. *In re Deepwater Horizon*, 786 F.3d 344, 354–55 (5th Cir. 2015).

The court's analysis of a motion to enforce a settlement agreement proceeds in two steps. First, the moving party must prove that the parties reached an agreement regarding all material terms. *Thompson v. Cont'l Emsco Co.*, 629 F. Supp. 1160, 1164 (S.D. Tex. 1986) (Bue, J.). If the court finds that an agreement was reached, the non-moving party must prove that the agreement is tainted with invalidity and should not be enforced. *See id.* (noting that the non-moving party could meet this

burden by proving that counsel did not have authority to settle the case); *see also Smith v. Amedisys Inc.*, 298 F.3d 434, 441 (5th Cir. 2002) (explaining that the non-moving party has the burden to demonstrate that the release "was invalid because of fraud, duress, material mistake, or some other defense"). In performing this analysis, the court is primarily concerned with whether the release was "knowing and voluntary." *See Smith*, 298 F.3d at 441 ("A release of a Title VII claim is valid only if it is 'knowing and voluntary.'"). Therefore, the court will first address whether an agreement was formed as to all material terms and then discuss whether Lozano has valid defenses to enforcement of the agreement, such as his attorneys' lack of authority to enter into the agreement.

**B. Analysis**

**1. Formation of the Settlement Agreement**

As noted above, a settlement agreement is a contract. *Lopez*, 2010 WL 4639046, at *4. "The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Restatement (Second) of Contracts § 17 (Am. Law. Inst. 1981). In order to find that the parties formed a settlement agreement, the court must determine whether there was "proper acceptance of an offer." *E.N. Bisso & Son, Inc. v. World Marine Transp. & Salvage, Inc.*, No. CIV. A. 94-0690, 1996 WL 28520, at *3 (E.D. La. Jan. 23, 1996). "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24. "Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." *Id.* § 50.

It is undisputed that METRO offered to settle this case and that Lozano would receive adequate consideration under the agreement. *See* Dkt. 84, Ex. 1 (confirming the terms of METRO's offer, and noting that Lozano would receive a payment of $75,000 under the settlement). Rather,

with respect to contract formation, the primary dispute between the parties centers on whether METRO's offer was accepted.

### i. Oral Agreement

The parties purportedly formed a settlement agreement over the phone on the evening of May 21, 2016. Dkt. 61 at 2. Following this conversation, Ramirez sent an email to the Kennard Richard attorneys to confirm the terms of the settlement. Dkt. 84, Ex. 1. Kennard responded. Dkt. 84, Ex. 2. Lozano dedicates the majority of his briefing to the issue of whether the email exchange constitutes an agreement. Dkt. 68 at 14–19; Dkt. 89 at 2–7. Lozano did not significantly address whether an enforceable agreement was reached over the phone. METRO, however, argues that a verbal agreement was reached over the phone and that any dispute over whether the email exchange constitutes an agreement is a red herring. Dkt. 78 at 18–19. This argument is important because an oral agreement to settle a Title VII claim is generally valid and enforceable. *See Fulgence*, 662 F.2d at 1209 ("Absent a factual basis rendering it invalid, an oral agreement to settle a Title VII claim is enforceable against a plaintiff who knowingly and voluntarily agreed to the terms of the settlement or authorized his attorney to settle the dispute."); *see also Harmon v. Journal Pub. Co.*, 476 F. App'x 756, 757–58 (5th Cir. 2012) (per curiam) (explaining that "agreements to settle Title VII claims . . . are not required to be reduced to writing and oral settlement agreements are enforceable").

Here, the evidence indicates that the parties reached an oral settlement agreement by phone and intended to be bound by the terms of that agreement. *See* Dkt. 85 at 18, 21–22, 83–84, 85 (Kennard's testimony) (testifying that the parties reached an agreement as to all essential terms over the phone and that Ramirez stated that he would send an email as a confirmation of the agreement); *id.* at 25–26, 92–93 (testifying that the email was an "accurate representation" of the agreement that

7

had already been reached); *id.* at 163 (Dupree's testimony) (testifying that he reviewed the email to ensure that it contained all of the terms that had been previously agreed to between Kennard and Ramirez); *id.* at 165 (testifying that the email served as a confirmation of the agreement). Further, the text of the email itself makes clear that the email was intended to serve merely as a confirmation of the agreement already reached by phone. Dkt. 84, Ex. 1 ("The purpose of this email is to *confirm* the settlement in the above-referenced matter." (emphasis added)). Ramirez's email establishes that all material terms of the settlement had already been discussed and agreed upon. *Id.* (confirming the resolution of numerous issues that had been agreed to by phone, including payment, release of claims, and confidentiality); *see Neeley v. Bankers Tr. Co. of Tex.*, 757 F.2d 621, 628 (5th Cir. 1985) (noting that the essential terms are those that the parties reasonably regarded as "vitally important ingredient[s] in their bargain"); *see also In re Deepwater Horizon*, 786 F.3d at 357 n.26 (collecting cases indicating that the amount of settlement payment and release of claims are generally the material terms); *Demissie v. Starbucks Corp. Office & Headquarters*, 118 F. Supp. 3d 29, 35 (D.D.C. 2015) (noting that "courts have found that the amount to be paid and the release of liability are material terms to a settlement agreement").

Although the email confirmation of the settlement has proven to be a wise precaution, the email exchange was not necessary because an enforceable agreement had already been formed over the phone. *See, e.g.*, *Tiburzi v. Dep't of Justice*, 269 F.3d 1346, 1352 (Fed. Cir. 2001) ("Parties often enter into oral contracts with the understanding that a written contract will follow that merely memorializes the oral contract. It is well-settled under our cases that if no written agreement is forthcoming, the oral agreement still governs."); *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997) (holding that parties are bound by an oral agreement, even where they contemplate later memorializing that agreement in an executed document, unless it is established that

8

the parties did not intend to be bound until the signing of a written agreement); *Demissie*, 118 F. Supp. 3d 29 at 34–35 (explaining that the court would enforce an oral agreement reached as to all material terms unless the evidence shows that the parties did not intend to be bound by their words alone). As noted above, the evidence indicates that the parties intended to be bound by their verbal agreement as to the material terms of the settlement, and this intent was not contingent on the settlement being reduced to writing. Accordingly, the court finds that a binding settlement agreement was formed by phone on the evening of May 21, 2016.

### ii. Email Agreement

Although the court finds that a binding settlement agreement was formed by phone, the court acknowledges that the parties have significantly disputed whether the email exchange constitutes a settlement agreement. Therefore, out of caution, the court will address whether the email exchange also constitutes a binding agreement. On the evening of May 21, 2016, Ramirez emailed Kennard and Dupree to confirm the settlement agreement. Dkt. 84, Ex. 1. The email states in part:

> Defendant Metropolitan Transit Authority of Harris County (METRO/Defendant) agrees to pay Plaintiff Jose "Robert" Lozano (Lozano/Plaintiff) $75,000.00 ($45,000.00 to Plaintiff, $30,000.00 to Plaintiff's counsel), so long as, Plaintiff executes a Confidential Settlement Agreement (Agreement) that includes the following items 1-6 listed below and waives any and all claims against METRO through the expiration of his employment, including his 90 day non-paid administrative leave status.

*Id.* The email then lists the remaining terms of the agreement. *Id.* (providing for a neutral letter of reference, mutual non-disparagement clause, confidentiality clause, provision regarding employer inquiries about Lozano, resignation, and non-paid administrative leave). The email asks for a response "to confirm the settlement of the Parties as set forth herein." *Id.* The email finally states

that "Plaintiff agrees that he will execute a settlement including the terms herein by 1:00PM tomorrow (May 22, 2016)." *Id.*

Kennard responded about thirty minutes later.  Dkt. 84, Ex. 2.  His email states:

> Agreed.  Of course, we will make every best effort to get a final version of the settlement agreement signed, discussed, and executed by all parties prior to 1 PM, however it may extend somewhat beyond that, but under no circumstance do we intend to not have a final agreement in place prior to 5 PM on Sunday.

*Id.*  The parties dispute whether this email exchange constitutes a binding agreement.  The parties disagree regarding (a) whether Kennard's email constitutes a counter-offer; (b) whether there was a failure of a condition precedent because Lozano never signed the formal Confidential Settlement Agreement, and (c) whether the email exchange was merely an unenforceable "agreement to agree."

### a.  Counter-Offer

Lozano first argues that Kennard's email is a counter-offer in two respects: (1) Kennard did not agree that the settlement would be finalized by 1:00 pm; rather, he stated that he would use "every best effort" to have the agreement finalized by that time; and (2) Kennard referenced that he would attempt to ensure that "*all parties*" signed the settlement agreement by 1:00 pm, whereas Ramirez's email stated only that *Lozano* must sign the agreement by 1:00 pm.  Dkt. 68 at 15–16; Dkt. 89 at 4–6.  A "counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer.  An offeree's power of acceptance is terminated by his making of a counter-offer, unless the offeror has manifested a contrary intention or unless the counter-offer manifests a contrary intention of the offeree."  Restatement (Second) of Contracts § 39.

Regarding Kennard's reference to "all parties," there is no indication that these words were intentionally chosen to vary the terms of the offer, nor is there evidence that any person interpreted

these words as a departure from the offer.  Certainly, Kennard can only be responsible for his own client's signing of the settlement agreement and could not attempt to make a representation regarding what time METRO would sign the settlement agreement.  When considering whether a purported acceptance constitutes a counter-offer, the court will find a counter-offer only where there is a "*material* variation of the original offered terms." *E.N. Bisso & Son*, 1996 WL 28520, at \*3 (emphasis added); *see also Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 513–14 (Tex. 2014) (noting that generally "an acceptance may not change or qualify the material terms of the offer," "[b]ut the materiality of the altered term is key, and an immaterial variation between the offer and acceptance will not prevent the formation of an enforceable agreement").  Although Kennard may have chosen imprecise language in his email, the court finds that his reference to "all parties" was simply an immaterial variation in wording, did not alter the terms of the agreement, and did not constitute a counter-offer.

Regarding Kennard's reference to "best efforts," Lozano has cited several cases discussing best efforts provisions in contracts.  Dkt. 89 at 4–6.  However, these cases do not hold or even suggest that "best efforts" are magical words that constitute a counter-offer as a matter of law.  As noted above, the court must focus its inquiry on whether the variation between the offer and the acceptance is *material*.  METRO argues that the time frame for signing the formal agreement was immaterial to the agreement.  Dkt. 71 at 2–3.  METRO contends that Kennard's email merely provided notice that the agreement may not be formalized by 1:00 pm.  Dkt. 87 at 4.  Lozano suggests, however, that the time was material because the parties had an upcoming trial date. Dkt. 89 at 5.

The court agrees with METRO that the evidence establishes that the 1:00 pm time frame for signing the formal agreement was immaterial.  The plain text of Ramirez's email undermines

11

Lozano's interpretation.  In the email, Ramirez states the monetary sum of the settlement and the release of claims, then lists "the following items 1-6" that are terms of the settlement agreement. Dkt. 84, Ex. 1.  After these terms are listed, Ramirez asks for confirmation of the agreement.  *Id.* At the end of the email, only after all terms of the agreement have been listed and after Ramirez asks for confirmation of those terms, Ramirez states the 1:00 pm time frame for executing the settlement agreement.  *Id.*  The structure of the email therefore belies the interpretation that the 1:00 pm time frame was one of the material terms of the agreement.  The testimony at the evidentiary hearing supports the conclusion that the 1:00 pm deadline was not a material term of the settlement agreement.  *See* Dkt. 85 at 27–28 (Kennard's testimony) (testifying that an agreement had been reached as to the terms of the agreement and that the discussion regarding the 1:00 pm time frame merely related to "papering the deal").  Further, the parties' behavior is not consistent with the interpretation that the 1:00 pm time frame was a material term of the agreement.  After Ramirez received Kennard's email with the "best efforts" language on the evening of May 21, 2016, Ramirez subsequently emailed the court on the morning of May 22, 2016, to inform the court that a settlement was in place.  Dkt. 61 at 3.  Therefore, METRO waived the trial setting even though a formal settlement agreement had not been signed and would not be finalized for some time.  This behavior suggests both that the 1:00 pm time frame was not a material term of the agreement and that METRO did not view Kennard's email as a counter-offer.  The court finds that the "best efforts" language in Kennard's email dealt strictly with an immaterial provision and therefore did not materially vary the terms of the offer.  In responding that he "agreed" to the terms in Ramirez's email, Kennard accepted all material terms of the offer without qualification.  Therefore, Kennard's email was not a counter-offer as a matter of law.

Further, the court finds that even if it assumes that Kennard's email constitutes a counter-offer, METRO accepted that counter-offer.  As discussed above, after receiving Kennard's "counter-offer," METRO's counsel informed the court the following day that a settlement had been reached in the case.  Dkt. 61 at 3.  Therefore, there can be no doubt that METRO treated any counter-offer as being accepted and considered the case settled.  *See R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) (noting that a party's intent to be bound can be inferred from its conduct under the circumstances).  This understanding is confirmed by another email between Ramirez and Kennard on May 22, 2016, in which Ramirez states: "As agreed, let's get this signed by no later than 5pm today."  Dkt. 83, Ex. 14.  This email makes clear that Ramirez agreed to Kennard's "counter-offer" that the settlement agreement may not be signed until 5:00 pm, rather than the 1:00 pm deadline Ramirez suggested.  Accordingly, the evidence establishes that METRO accepted any counter-offer.

### b.  Condition Precedent

Lozano next argues that the settlement agreement is unenforceable because of a failure to satisfy a condition precedent to contract formation.  Dkt. 68 at 16; Dkt. 89 at 2–3.  "A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises.  [T]he failure of a condition to occur excuses performance by a party whose performance is dependent on its occurrence."  *In re Deepwater Horizon*, 786 F.3d at 361 (footnotes and citations omitted); *see also Landscape Design & Constr., Inc. v. Harold Thomas Excavating, Inc.*, 604 S.W.2d 374, 377 (Tex. App.—Dallas 1980, writ ref'd n.r.e.) (noting that a court will generally not construe language as a condition precedent where another reading of the contract is possible).  Lozano argues that the signing of a finalized "Confidential Settlement Agreement" by 1:00 pm on May 22, 2016, was a condition precedent to

13

the formation of a binding settlement agreement.  Dkt. 68 at 16–17; Dkt. 89 at 2–3.  It is undisputed

that Lozano never signed the Confidential Settlement Agreement.  Lozano emphasizes that

Ramirez's email uses conditional language and states that "Defendant Metropolitan Transit

Authority of Harris County (METRO/Defendant) agrees to pay Plaintiff Jose 'Robert' Lozano

(Lozano/Plaintiff) $75,000.00 ($45,000.00 to Plaintiff, $30,000.00 to Plaintiff's counsel), *so long*

*as*, Plaintiff executes a Confidential Settlement Agreement."  Dkt. 84, Ex. 1 (emphasis added).

Lozano also notes that Ramirez's email states that "Plaintiff agrees that he will *execute a settlement*

including the terms herein by 1:00PM tomorrow." *Id.* (emphasis added).

In support of his position, Lozano cites to *In re Deepwater Horizon*.  Dkt. 89 at 2–3.

However, that case is directly opposite to Lozano's position.  In *In re Deepwater Horizon*, plaintiff

Johnson allegedly sustained injuries as a result of the Deepwater Horizon explosion.  786 F.3d at

348.  Johnson received a settlement offer from a claims facility created to settle claims on behalf of

defendant BP.  *Id.* at 349.  The offer stated that "[t]he amount of the Final Payment Offer . . . is

$298,095.00, which is the amount that can be paid now if you decide to accept the Final Payment

Offer and you sign a Release and Covenant Not to Sue." *Id.*  BP argued that, although Johnson

mailed an election form indicating that he accepted the offer, no contract was formed because

Johnson never signed a formal release.  *Id.* at 355-56.  The Fifth Circuit rejected this argument.  The

court explained that

> [a] settlement is valid and enforceable even if it contemplates the
> parties signing a release at a later date, unless the parties explicitly
> provide that a valid contract will not be formed until the parties
> execute a formal, finalized agreement.  Even if one party ultimately
> fails to execute or sign the final formal release documents, that does
> not void the original agreement or render it deficient from the outset
> . . . Because the Determination Letter does not state that a signed
> release is a prerequisite to *contract formation* (as opposed to a
> prerequisite to *payment*), the fact Johnson ultimately did not sign the

14

>Release is immaterial to the question of whether the parties formed
>a binding contract.

*Id.* (footnotes and citations omitted).  Similarly, in this case, the parties made a binding settlement

agreement, and Lozano's subsequent refusal to sign the formal settlement documents does not void

that agreement.  *See also Villanueva v. CNA Ins. Cos.*, 868 F.2d 684, 686 (5th Cir. 1989) (holding

that execution of formal "receipt, release, and indemnity document" was a "condition subsequent"

to the informal agreement between the attorneys—therefore, the failure to execute the formal

agreement did not defeat the underlying settlement), *abrogated on other grounds by Salve Regina*

*Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217 (1991).  Also like in *In re Deepwater Horizon*, the

language of Ramirez's email makes clear that the signing of the Confidential Settlement Agreement

was, at most, a condition precedent to *payment*, not contract formation.  Ramirez's email states that

METRO would pay "$75,000.00 ($45,000.00 to Plaintiff, $30,000.00 to Plaintiff's counsel), so long

as, Plaintiff executes a Confidential Settlement Agreement."  Dkt. 84, Ex. 1.  Therefore, as the court

held in *In re Deepwater Horizon*, the fact that Lozano did not sign the Confidential Settlement

Agreement "is immaterial to the question of whether the parties formed a binding contract."

Further, the court notes that Lozano is attempting to avoid enforcement of the settlement

based on his own refusal to sign the Confidential Settlement Agreement.  The *In re Deepwater*

*Horizon* court dealt with this issue as well.  BP argued that it was not required to pay under the

settlement because Johnson never satisfied the condition precedent of signing a release.  *In re*

*Deepwater Horizon*, 786 F.3d at 361.  However, BP never mailed a release to Johnson, so he was

unable to sign it.  *Id.*  The court explained that

>[f]ulfillment of a contract promise . . . is not excused by failure of a
>condition . . . which the promisor himself causes to happen.  It is a
>principle of fundamental justice that if a promisor is himself the cause
>of the failure of performance, either of an obligation due to him or of

> a condition upon which his own liability depends, he cannot take
> advantage of the failure.  This is known as the doctrine of prevention.

*Id.* (footnotes and citations omitted).  Applying this doctrine, the court found that because BP prevented Johnson from signing a release, his failure to sign the release did not categorically bar him from recovering under the agreement.  *Id.*  Similarly, here, even assuming that the execution of the Confidential Settlement Agreement constitutes a "condition precedent," Lozano himself refused to sign the agreement and caused the failure of that condition precedent.  Lozano may not take advantage of his own failure to sign the Confidential Settlement Agreement as a mechanism to avoid his obligations under the agreed-upon settlement.  Further, the court notes that Lozano's signing of the Confidential Settlement Agreement was a condition imposed by METRO and for METRO's benefit.  Therefore, METRO has the power to waive the condition.  *See Villanueva*, 868 F.2d at 686 (noting that execution of a formal release was a condition which the defendant imposed on the plaintiff and thus had the right to waive).  Accordingly, the court finds that Lozano's failure to sign the Confidential Settlement Agreement does not affect the settlement agreement formed between the parties by telephone and later confirmed by email.

### c.  Agreement to Agree

Lozano argues that any settlement reached on May 21, 2016, was merely an unenforceable "agreement to agree."  Dkt. 68 at 17; Dkt. 89 at 4.  Lozano notes that the parties exchanged drafts of the Confidential Settlement Agreement which contained additional terms not included in Ramirez's email.  Dkt. 68 at 18; Dkt. 89 at 4; *see also* Dkt. 83, Exs. 18–19.  Therefore, Lozano contends that the email agreement was merely an unenforceable "agreement to agree" on all material terms at a later point.  Dkt. 68 at 18–19; Dkt. 89 at 4.

An "agreement to agree" is an agreement which "leaves essential terms open for future negotiations" and therefore is not a binding contract. *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323 (5th Cir. 2006).  Accordingly, to determine whether an agreement is an "agreement to agree" the court must determine "whether its 'essential terms' are set forth in the agreement or are left to future negotiation." *Id.*  However, the parties "may choose to leave non-essential terms open for later negotiation without rendering the agreement unenforceable." *Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012).  The court decides whether a particular term is material or essential on a case-by-case basis. *Id.*

It is self-evident that an initial agreement between the parties will not contain all of the terms that will eventually appear in the formal agreement.  This, of course, does not categorically render the initial agreement unenforceable—in other words, the requirement that the parties reach an agreement as to "all material terms" clearly does not require that the parties reach an agreement as to every term.  *See* Restatement (Second) of Contracts § 33 cmt. a ("But the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon."); *see also Coe*, 695 F.3d at 320 (noting that non-essential terms may be left open); *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("A binding settlement may exist when parties agree upon some terms, understanding them to be an agreement, and leave other terms to be made later.").  Here, the court has already found that all material terms of the settlement were agreed upon at the time of the phone conversation and email exchange.  *See* Dkt. 84, Ex. 1 (listing numerous terms of the agreement, including the monetary sum, release of claims, Lozano's resignation, mutual non-disparagement, and confidentiality); *see also In re Deepwater Horizon*, 786 F.3d at 357 n.26 (collecting cases holding that the monetary amount of settlement payment and the release of specific

17

claims are generally material terms but that the specific language of the release is not material); *Trnka v. Elanco Prods. Co., a Div. of Eli Lilly & Co.*, 709 F.2d 1223, 1226 n.2 (8th Cir. 1983) ("[T]he fact that the parties left insubstantial matters for later negotiation, or that certain ministerial tasks remained to be performed in order to implement the settlement, 'does not vitiate the validity of the agreement reached.'"); *Demissie*, 118 F. Supp. 3d at 35 (noting that courts have found the amount to be paid and release of liability to be material terms); *id.* at 37 ("[T]he Court is able to conclude that the parties reached agreement on all material terms: the settlement amount, plaintiff's agreement to voluntarily resign and not reapply, plaintiff's release of all claims, excluding the worker's compensation claim, and confidentiality of all material terms."); *Disney v. Gollan*, 233 S.W.3d 591, 595 (Tex. App.—Dallas 2007, no pet.) ("The essential terms for a settlement agreement are the amount of compensation and the liability to be released.").

Lozano has identified only two terms that were missing from the informal email agreement that he contends are "material": (1) an Older Workers Benefit Protection Act (OWBPA) provision and (2) a provision that Lozano would receive his accrued vacation time. Dkt. 68 at 18; Dkt. 89 at 4. Regarding the OWBPA provision, there is no evidence that this term was ever raised by either party at any point during the settlement negotiations, let alone that either party considered this term "material." The only discussion of the OWBPA provision in the record is a series of emails between Dupree and Ramirez that occurred on May 22, 2016, after the settlement agreement had already been reached. Dkt. 83, Ex. 14. Clearly, terms that arise when formalizing the release agreement that played no part in the parties' actual negotiations cannot be considered material. *See Demissie*, 118 F. Supp. 3d at 35 ("For example, terms that were not discussed by the parties during negotiations, but are only brought up after-the-fact, may be deemed immaterial."). Regarding Lozano's accrued vacation time, Kennard testified without contradiction that METRO's policy was that "any departing

employee gets their vacation . . . that was not a contested item." Dkt. 85 at 94.  Therefore, there was

no reason to include any reference to Lozano's accrued vacation time in the email because Lozano's

accrued vacation time was not a negotiated item—there was no dispute that Lozano, like all

departing METRO employees, would receive his accrued vacation time by default.

The court is not aware of, nor has Lozano identified, any material terms that the parties "left

to future negotiation" at the time of their May 21, 2016 settlement agreement.  Accordingly, the court

finds that METRO proposed a settlement regarding all material terms, which Kennard unequivocally

accepted both over the phone and in his email stating that he "[a]greed" to the terms.  *See* Dkt. 84,

Ex. 2.  Therefore, METRO has established that a binding settlement was reached as to all material

terms on the evening of May 21, 2016.  Having found that a settlement was reached, the court will

now address Lozano's potential defenses to enforcement of the settlement agreement.

### 2. Defenses to the Settlement Agreement

#### i. Breach

Lozano argues that, even assuming the parties reached a binding settlement agreement on

May 21, 2016, METRO breached that agreement, thereby excusing Lozano from performing.

Dkt. 68 at 19; Dkt. 89 at 7.  Lozano notes that Ramirez's email states that "[Lozano] will be

designated as on non-paid administrative leave for 90 days *following* execution of the [Confidential

Settlement Agreement]."  Dkt. 84, Ex. 1 (emphasis added).  However, it is undisputed that (1) the

Confidential Settlement Agreement was never executed, yet (2) METRO placed Lozano on non-paid

administrative leave on May 23, 2013.  Lozano argues that METRO breached the contract because

it placed Lozano on non-paid administrative leave before the Confidential Settlement Agreement was

executed.  Dkt. 68 at 19; Dkt. 89 at 7.  Therefore, Lozano concludes that he is excused from

performing under the settlement agreement based on the principle that "when one party to a contract

commits a material breach of the contract, the other party is discharged or excused from further performance." *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004).

The court finds no reason to believe that the exact day on which METRO placed Lozano on administrative leave was material to the parties.  The parties anticipated that the Confidential Settlement Agreement would be executed by 5pm on May 22, 2016. Dkt. 83, Ex. 14.  However, Lozano refused to sign the agreement, and METRO placed Lozano on administrative leave the following day.  The court cannot conclude that METRO's placement of Lozano on administrative leave after a settlement had been reached and one day after the Confidential Settlement Agreement should have been executed constitutes a material breach of the agreement.  Further, the court emphasizes again that Lozano cannot take advantage of his own failure to execute the Confidential Settlement Agreement as a method to avoid his obligations under the settlement.  *In re Deepwater Horizon*, 786 F.3d at 361.  Moreover, as noted above, Lozano's execution of the Confidential Sentiment Agreement was a condition imposed by METRO which METRO had the right to waive. *See Villanueva*, 868 F.2d at 686 (finding that execution of a formal release was a condition subsequent to the underlying settlement and was a condition which the defendant imposed on the plaintiff and thus had the right to waive).  Accordingly, the court finds no material breach by METRO that would excuse Lozano's performance under the settlement agreement.

### ii.  Lack of Authority

Lozano argues that the evidence establishes that the Kennard Richard attorneys did not obtain his authority to settle the case or, if they did, they obtained that authority through "fraud, coercion, deception and/or without fully and completely informing Mr. Lozano of his legal rights."  Dkt. 89 at 7–8.   METRO argues that the evidence establishes that the Kennard Richard attorneys fully informed Lozano of his rights and received settlement authority. Dkt. 87 at 8–9.  METRO contends

that there is no credible evidence to support Lozano's contention that he did not voluntarily settle this case. *Id.*

An agreement to settle a Title VII claim must be "knowing and voluntary." *Smith*, 298 F.3d at 441. In determining whether a release was knowingly and voluntarily executed, the court considers the totality of the circumstances. *Id.* The party attacking a settlement bears the burden of showing that the settlement is tainted with invalidity. *Harmon*, 476 F. App'x at 757. The party opposing enforcement of a settlement agreement is allowed an evidentiary hearing regarding the validity and scope of the agreement. *Id.* at 757–58. "While an attorney may not settle a case without express authority, 'an attorney of record is presumed to have authority to compromise and settle litigation of his client.'" *Id.* (quoting *Mid-S. Towing Co.*, 733 F.2d at 390). Therefore, where a party argues that his attorney did not have authority to settle the case on his behalf, he bears the burden of establishing that there is some basis for holding that his attorney lacked authority to settle. *Id.* at 758.

On June 22, 2016, the court held an evidentiary hearing on the issue of whether the Kennard Richard attorneys had authority to settle this case on Lozano's behalf. *See* Dkts. 82, 85. At the hearing, both Kennard and Dupree testified that Lozano told them to "go do it" during a phone conversation on May 21, 2016—in other words, Lozano gave them authority to settle the case on his behalf according to the terms they had discussed with him. *See* Dkt. 85 at 18 (Kennard's testimony) (testifying that he asked Lozano "do you want me to go do the deal?," to which Lozano replied "go do it"); *id.* at 21 (testifying that he understood "go do it" to mean that he should go settle the case); *id.* at 118 (Dupree's testimony) (testifying that, after Kennard explained the parameters of the settlement agreement to Lozano, Lozano responded "go do it"). Both Lozano and Ms. Lozano, who had listened to the phone call, gave directly opposite testimony, claiming that Lozano had never used

21

the words "go do it" and had never given settlement authority.  *Id.* at 175–76, 205–06 (Lozano's testimony) (testifying that he had never told his attorneys to "go do it" or any words to that effect); *id.* at 235–36 (Ms. Lozano's testimony) (testifying that Lozano had never used the words "go do it" and did not commit to settle).

After observing the witnesses, listening to their testimony, and reviewing their testimony, the court finds that the Lozanos are not credible witnesses.  The court therefore credits the version of events reflected in Kennard and Dupree's testimony and finds that Lozano affirmatively gave the Kennard Richard attorneys the authority to settle the case on his behalf after being fully informed of the terms of the settlement.  The Lozanos' testimony at the evidentiary hearing was often inconsistent, undermined Lozano's theory of the case, and caused the court to seriously question the truth of the testimony:

•      Lozano's attorney indicated at the hearing that Lozano had not been "fully informed" of his rights and therefore suggested that the settlement was not entered "knowingly." Dkt. 85 at 127–28, 279–80.  However, this theory of the case was severely undermined when Ms. Lozano testified extensively to details of the settlement agreement that she had heard the Kennard Richard attorneys discussing with Lozano during the May 21, 2016 phone call.  *Id.* at 246–47 (Ms. Lozano's testimony) (testifying that, during the phone conversation, Lozano discussed with the Kennard Richard attorneys the detailed terms of the settlement, including the monetary pay, resignation from METRO, health insurance, retirement, and vacation).

•      Both Lozano and Ms. Lozano indicated that Lozano would never even consider the possibility of settlement if resignation from METRO was a requirement.  Dkt. 85 at 214–16 (Lozano's testimony) (stating that he had no intention of settling the case if

22

resignation was part of the deal); *id.* at 261 (Ms. Lozano's testimony) (agreeing that her husband would never consider or contemplate any settlement because he was not interested in leaving METRO). However, the evidence indicates that Lozano considered in great detail the possibility of settlement and that he was aware resignation would be a term of any settlement. *Id.* at 179 (Lozano's testimony) (testifying that he knew resignation was part of the deal); *id.* at 257 (Ms. Lozano's testimony) (testifying that they knew Lozano couldn't return to METRO); *id.* at 206 (Lozano's testimony) (testifying that he asked his attorneys to send him the settlement paperwork); Dkt. 83, Ex. 13 (text message from Lozano to Dupree stating that he wanted to "sleep on" the possibility of settlement); Dkt. 83, Ex. 6 (text message from Lozano to Kennard, stating "[a]nd I take my retirement with me"); Dkt. 85 at 246–47, 257 (Ms. Lozano's testimony) (testifying that, during the May 21, 2016 phone conversation, Lozano discussed with the Kennard Richard attorneys the detailed terms of the settlement, including monetary pay, resignation from METRO, health insurance, and vacation, and that her husband had specifically inquired about his retirement). Moreover, Lozano admitted that he was looking into another job opportunity outside of METRO. Dkt. 85 at 179–80 (Lozano's testimony) (testifying that he was discussing with a friend the possibility of a job at another agency). Further, Ms. Lozano's testimony suggested that she strongly encouraged Lozano to take the settlement and resign. *Id.* at 253 (Ms. Lozano's testimony) (testifying that she told Lozano that "you always ask my opinion and then you turn around and do the exact opposite," but that this comment was a "running joke"); *id.* at 254–56 (testifying that she had told Lozano "if you ask me now, [ ] go ahead and put this behind you," that "you are putting this family in a terrible position financially," that "if you don't want the money, give it to me," and that "if you

23

don't care about the money, put it in a savings account for your children").

- At multiple points during the hearing, the court was left with the impression that the Lozanos were merely parroting their attorney's arguments rather than testifying based on actual events:

  - *Compare* Dkt. 85 at 59 (Lozano's attorney) (emphasizing a text message between Dupree and Kennard where Dupree wrote that Lozano "thinks he has a choice but he doesn't"), *with id.* at 194, 215 (Lozano's testimony) (testifying that Dupree told him in person "[y]ou act like you have a choice here, but you don't have a choice"), *and id.* at 235 (Ms. Lozano's testimony) (testifying that Dupree told Lozano on yet another occasion by phone that "you think you have a choice but you don't").

  - *Compare* Dkt. 85 at 122–125 (Lozano's attorney) (discussing several witnesses that Dupree did not depose, and suggesting that he was not prepared for trial), *with id.* at 218 (Lozano's testimony) (testifying that he had asked the Kennard Richard attorneys "Why aren't you going to interview all these witnesses I have?").

- Lozano testified that the Kennard Richard attorneys convinced him that he had no choice but to resign.  Dkt. 85 at 192, 194, 201, 217 (Lozano's testimony).  However, he also testified that a vice president of METRO had recently told him that there was no reason for him to resign and that METRO had not even thought about asking him to leave.  *Id.* at 199.  Given that a vice president of METRO had told Lozano he did not need to resign, it is difficult to credit his testimony that he believed resignation was his only option.

24

The court finds that the Lozanos' testimony was inconsistent and not credible, and the court concludes that Lozano gave the Kennard Richard attorneys the authority to settle the case after he was fully informed of his rights and the terms of the agreement.  However, Lozano has also argued that, even assuming he gave settlement authority, that this authority was procured by "fraud, coercion, and deception."  Dkt. 89 at 8.  Lozano has indicated that certain parts of the record establish that the Kennard Richard attorneys used "fraud, coercion, and deception" to obtain his settlement authority:

- Lozano emphasizes a text message between Kennard and Dupree in which Dupree states that Lozano had "60 in actual damages . . . he thinks he has a choice but he doesn't."  Dkt. 83, Ex. 15.  The court notes that this text was not sent to Lozano but was merely a discussion between Kennard and Dupree.  Therefore, this text says very little about what pressure the Kennard Richard attorneys put on Lozano.  The court does not credit the Lozanos' testimony that any similar statements were made directly to them. The court notes that this text message was immediately followed by a message stating "[t]hey are telling him they don't want him." Dkt. 85, Ex. 15.  The context suggests that the text was intended to convey that Lozano effectively had no choice but to leave METRO because METRO did not want him to be employed there. *See also* Dkt. 85 at 154 (Dupree's testimony) (stating that METRO had been sending Lozano a signal all throughout the proceedings that it wanted him to leave).  This text falls far short of establishing that the Kennard Richard attorneys intended to pressure Lozano into settlement.

- Lozano cites a text in which Kennard wrote to Dupree: "Let's settle it."  Dkt. 83, Ex. 15.  Again, a text between Dupree and Kennard is very weak evidence of any "fraud, coercion, and deception" directed towards Lozano.  Furthermore, there can be no dispute that the

Kennard Richard attorneys believed that a settlement was in Lozano's best interest due to the court's decision to admit audio tapes into evidence that reduced Lozano's chance for success at trial and had the potential to damage his reputation.  Dkt. 85 at 15–17 (Kennard's testimony).   Kennard's belief that the case should be settled was not unreasonable and does not establish that he was willing to use fraudulent tactics to force Lozano to settle.

- Lozano cites another text between Dupree and Kennard where Dupree states that he "[m]ight have another crack at him in prep tomorrow if he continues to hold out.  Just FYI."  Dkt. 83, Ex. 15.  Lozano argues that this text indicates that Dupree intended to pressure Lozano into a settlement the following day.  Dkt. 89 at 9.  Again, however, this text is not direct evidence that any "fraud, coercion, and deception" was ever directed toward Lozano.  At most, it is potentially evidence of Dupree's intent to pressure Lozano.  However, at the evidentiary hearing, Dupree testified that "what I'm saying here is that if there is another opportunity to discuss settlement, it could be done at the prep session that we had previously scheduled."  Dkt. 85 at 149 (Dupree's testimony).  The court credits Dupree's testimony as to the meaning of his text and finds no fraudulent or coercive intent.

- Lozano emphasizes that the Kennard Richard attorneys failed to inform him of his option to non-suit this case with prejudice and that the attorneys told him he could be liable for METRO's legal fees.  Dkt. 89 at 9.  As noted above, the court finds that Lozano was fully informed of his rights in this case.  Further, the court finds that it is not "fraudulent" that the Kennard Richard attorneys failed to emphasize the possibility of non-suit, given that the case had been pending for two years.  Moreover, the court finds nothing fraudulent or coercive about the Kennard Richard attorneys informing Lozano that he could be liable for

METRO's legal fees.  In fact, it is an accurate statement of law that a plaintiff may be required to pay a defendant's legal fees in the event of a voluntary dismissal.  *See Yoffe v. Keller Indus., Inc.*, 580 F.2d 126, 129 n.9 (5th Cir. 1978) ("There is no doubt that a court has ample authority to award attorneys' fees as a term and condition of a Rule 41(a)(2) voluntary dismissal in order to protect defendants.").

- Lozano argues that he was not fully informed of his rights because his attorneys never forwarded Ramirez's email regarding the details of the settlement agreement.  Dkt. 89 at 9.  The court has previously found that Lozano was fully informed of his rights over the phone.  Moreover, Ramirez's email merely confirmed the terms of the settlement agreement, which Kennard and Dupree had discussed with Lozano only moments before. See Dkt. 85 at 114 (Dupree's testimony) (testifying that he and Kennard spoke with Lozano between 10:00 and 11:00 pm on May 21, 2016); Dkt. 84, Ex. 1 (Ramirez's email, sent at 10:42 pm on May 21, 2016).  Therefore, the court finds that it was unnecessary for the Kennard Richard attorneys to also forward Ramirez's confirmation email to Lozano. *See* Dkt. 85 at 161 (Dupree's testimony) (testifying that there was no need to forward the email to Lozano because "it was exactly what he had authorized before in our previous conversation").

- Lozano alleges that on May 22, 2016, Dupree attempted to pressure him into signing the Confidential Settlement Agreement and told him that trial was no longer an option. Dkt. 89 at 9.  These allegations are irrelevant to the question before the court: whether the attorneys had authority to settle the case on the evening of May 21, 2016.

- Lozano testified that Dupree told him that if he attempted to return to work, METRO would simply fire him for no reason because Texas is an "at-will" employment state.

Dkt. 85 at 196–97 (Lozano's testimony). Dupree testified, however, that Lozano had made an incorrect statement that he was "guaranteed employment," and Dupree mentioned the at-will nature of his employment only to correct this misapprehension. *Id.* at 152–53 (Dupree's testimony). The court credits Dupree's testimony that he did not reference the concept of "at-will" employment in an attempt to coerce Lozano into settling.

After reviewing the evidence, the court finds that Lozano has not produced sufficient evidence to establish that the Kennard Richard attorneys used "fraud, coercion, and deception" to pressure Lozano into settling the case. Lozano has failed to rebut the presumption that the Kennard Richard attorneys had authority to settle on his behalf. Furthermore, the credible evidence establishes that Lozano affirmatively gave the Kennard Richard attorneys authority to settle the case, and the settlement was entered into knowingly and voluntarily. On a full review of the evidence, the court finds that Lozano agreed to settle the case while being fully informed of his rights on May 21, 2016, yet subsequently changed his mind when presented with the settlement paperwork on May 22, 2016. However, the law does not permit Lozano to second guess a previously authorized settlement agreement. *See Fulgence*, 662 F.2d at 1209 ("If a party to a Title VII suit who has previously authorized a settlement changes his mind when presented with the settlement documents, that party remains bound by the terms of the agreement."). Accordingly, METRO's motion to enforce settlement agreement is GRANTED.

## IV. CONCLUSION

METRO's motion to enforce settlement agreement (Dkt. 61) and Lozano's motion to strike

(Dkt. 90) are GRANTED.  A final judgment will issue consistent with this order.

Signed at Houston, Texas on July 19, 2016.

Gray H. Miller
United States District Judge